**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------------------- X

PAUL GOODMAN,                                          :

        Plaintiff,                              :

    -against-                                        :

                                                   Case No.: 08-cv-2851

MARTIN WADE, NOLAN QUAN, BLAIR MILLS,                   :
BROADCASTER, INC., GARY HERMAN, BRUCE                   (Stanton, J.)
GALLOWAY, THOMAS KIKIS, KIKIS FAMILY                    :
FOUNDATION, WILLOW CREEK CAPITAL
MANAGEMENT, TRINIDAD CAPITAL MASTER FUND,               :
LTD., AARON BROWN, ANDREW GARRONI, STRATEGIC
TURNAROUND EQUITY PARTNERS, LP (CAYMAN) and             :
DIGITAL CREATIVE DEVELOPMENT CORPORATION,

                                           :

        Defendants.
------------------------------------------------------------------------------- X

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------------------- X

MICHAEL GARDNER,                                       :    Case No.: 08-cv-2850

        Plaintiff,                              :    (Stanton, J.)

    -against-                                        :

                                           :

MARTIN WADE III, ,                                     :    **DECLARATION OF MICHAEL**
                                         **ZWEIG IN SUPPORT OF**
        Defendant.                              :    **DISMISSAL AND TRANSFER**
                                         :    **MOTIONS BY DEFENDANTS**

------------------------------------------------------------------------------- X

MICHAEL ZWEIG declares as follows pursuant to 28 U.S.C. § 1746:

    1.      I am a member of Loeb & Loeb LLP, attorneys for Defendant Broadcaster

Inc. ("Broadcaster") in this action.  I am admitted to practice before this Court and

respectfully submit this declaration, based on personal knowledge and a review of records, in

support of the moving Defendants' motions to dismiss or in the alternative to transfer the above-referenced actions, <u>Goodman v. Wade</u>, et. al. ["Goodman"] and <u>Gardner v. Wade</u>, ["Gardner"], to the District Court for the Central District of California pursuant to 28 U.S.C. § 1404(a). Attached to this Declaration (see ¶ ¶ 2 to 6) are documents referenced in the Accompanying Memorandum of Law, and, in support of the motion to transfer (¶¶ 9-13) a description of the material witnesses and a summary of the matters as to which they are expected to testify.

## <u>MOTIONS TO DISMISS GOODMAN AND GARDNER DEFAMATION ACTIONS</u>

2.    <u>Exhibits</u> -- For the convenience of the Court, the various draft iterations of the alleged defamatory statements from the 14C Information Statements filed by Broadcaster are annexed hereto as Exhibit 1.

3.    Paul Goodman's January 15, 2008 affidavit, filed by him in support of his motion for temporary restraining order, is annexed hereto as Exhibit 2.

4.    Broadcaster's Form 8K, filed with the SEC on February 22, 2008, with corresponding exhibits, is annexed hereto as Exhibit 3.

5.    Excerpts from the transcript of Michael Gardner's deposition, held on April 22, 2008 (pp. 92-94, and 160), are annexed hereto as Exhibit 4.

6.    <u>Goodman Failure to Provide (or File) Any Affidavits of Service</u> -- Paul Goodman has not, as of this date, provided to defense counsel nor filed with the Court any affidavits of service reflecting that the January 16, 2008 summons with notice in the <u>Goodman</u> action was served on any of the fourteen defendants. During the conference this

Court held on May 2, 2008, Paul Goodman represented to counsel and this Court that he would provide defense counsel with the affidavits of service for the defendants on whom service had been effected.  <u>See</u> Letter from Michael Zweig to this Court dated May 5, 2008, annexed hereto as Exhibit 5.  Defense counsel subsequently followed up with Paul Goodman requesting service of these affidavits prior to the due date of these motion papers.  <u>See</u> Letter from Michael Zweig to Paul Goodman dated May 9, 2008, annexed hereto as Exhibit 6.  Mr. Armstrong advised me that he separately telephoned Goodman, but his call was not returned.  No affidavits of service have to date been provided by Goodman to defense counsel, nor filed with the Court.

7.    <u>Manner of Service of Complaint in Gardner v. Wade</u> -- At Michael Gardner's invitation, Martin Wade, Nolan Quan, Blair Mills, Andrew Garroni and I attended a settlement meeting concerning the <u>Baytree</u> action on March 5, 2008, held in a conference room located in Gardner's office at Baytree Securities in downtown New York City.  The meeting was held in New York City at Gardner's request, allegedly due to Gardner's infirmities, and health issues rendering him unable to travel.  Messrs. Quan, Mills and Garroni traveled in from California, and Martin Wade from New Jersey, for the meeting.

8.    Preceding the meeting, Gardner had advised Blair Mills and Martin Wade, among others, that he would "never" invite them to a meeting and then serve them with process.  Notwithstanding, at the conclusion of this very brief and unsuccessful settlement meeting, service of process was effected at the meeting by Gardner's attorneys, Brian Gardner and Peter Sullivan, who were each present in Baytree's office at the time and caused the complaint to be personally served upon Mr. Wade.

## MOTIONS TO TRANSFER THE TWO DEFAMATION ACTIONS

9.    Background-- On April 18, 2008, this Court transferred two other related actions, Baytree Capital Assocs. v. Quan, et al., 08 Civ 01602 ["Baytree"] and Goodman §720 v. Broadcaster, et al., 08 Civ 02480 ["Goodman v. Broadcaster"] to the District Court for the Central District of California. All four of these actions arise out of the same operative facts. As this Court has already ordered the transfer of two of these actions, the moving defendants respectfully submit that the remaining two actions should be transferred as well, in the interests of judicial economy and efficiency, for the convenience of the parties and witnesses, including non-parties, and to avoid duplicative and uncoordinated discovery and litigation.

10.    In conjunction with preparing this motion to transfer and this accompanying declaration, I have conferred with Michael Armstrong of Howrey LLP, who is counsel for Nolan Quan, Martin Wade and Blair Mills. Mr. Armstrong concurs, on behalf of his clients, with the statements set forth herein (at ¶ 13) that the individuals listed below are expected to be material witnesses in the Goodman and Gardner actions.

11.    While the plaintiffs in the Goodman and Gardner actions, as well as a few of the witnesses, are New York residents, the overwhelming majority of the other witnesses are located in California, as was the operative conduct. Indeed, the contextual witnesses and facts are identical to those involved in the Baytree and Goodman v. Broadcaster actions. None of those witnesses are located in New York, and nearly all are in California. As this Court has already ruled with regard to the latter two actions, the Goodman and Gardner actions also belong in California.

12.    <u>The Material Witnesses Are Located In California, Thus Weighing Heavily In Favor of Transfer</u> – As noted, one of the factors to be considered in resolving a motion to transfer is the location and convenience of the material witnesses (and, collaterally, whether the attendance of any such unwilling witnesses could be compelled). Here, the convenience of the material witnesses weighs heavily – in fact, decisively – in favor of the transfer of this action to the District Court for the Central District of California.

13.    The material witnesses, and a summary of the matters as to which they are expected to testify, include the following:

<u>Material Witnesses Located in California:</u>

a.    Defendant Nolan Quan, a resident of Los Angeles, California, is currently Broadcaster's Chief Operating Officer. Mr. Quan is expected to testify as to, among other things: (1) his role as a Consenting Shareholder who voted to remove Mr. Goodman and Dr. Orza, "without cause" as directors of Broadcaster and the reasoning behind his decision; (2) his opinion of Mr. Goodman's business judgment and experience, or lack thereof, in managing companies in the media industry in connection with Mr. Goodman's performance as a director of Broadcaster; (3) his interactions with Mr. Goodman prior to the execution of the written consent; (4) his conversations with Mr. Goodman and with other shareholders and the impact of these conversations on his decision to vote to remove Mr. Goodman as a director of Broadcaster; (5) the alleged conspiracy between Defendants Martin Wade, Blair Mills, Andrew Garroni and himself to remove Mr. Goodman as a director, in order to seize control of Defendant Broadcaster; (6) the statements in Broadcaster's 14C Information Statement and the amendments thereto as an accurate depiction of the Consenting Shareholders' opinion of Mr. Goodman as a director of Broadcaster; (7) the publication in Broadcaster's 14C Information Statement and the amendments hereto of allegedly defamatory statements as an alleged retaliation against Mr. Goodman for disclosing the waste and fraudulent conversion of corporate funds by

Defendants Martin Wade, Nolan Quan, Blair Mills and Andrew Garroni; (8) the allegedly malicious filing of allegedly knowingly false and defamatory statements regarding Mr. Goodman; (9) the nature of the FTC proceedings; the truth or falsity of the allegations raised therein; his relationship, if any, to the FTC Defendants; and the settlement of the FTC action, Baytree's advocacy thereof, and Broadcaster's payment thereof in accordance with contractual indemnification provisions with certain FTC Defendants; (10) his knowledge concerning the alleged related-party transactions between Broadcaster and Longview, Frostham, Alchemy, Alchemy F/X and Broadcaster LLC; his knowledge of the services provided by these companies in exchange for payment by Broadcaster; his relationship, if any, to these companies and the approval of the subject transactions by Broadcaster and/or the Board Defendants; and (11) the reporting and calculation of "unique visitors" to the Broadcaster.com website; the services provided by Alchemy in regard thereto; Broadcaster's advertising expenditures; his compensation package and the re-negotiation and amendment thereof; the entitlement to the "Earn Out Shares" by Quan and Gardner; the issuance of shares based upon web traffic formula; and the operations of Broadcaster.

b.     Defendant Andrew Garroni, a resident of Los Angeles, California (who is <u>not</u> a Broadcaster employee as alleged by plaintiffs), is expected to testify as to, among other matters: (1) his role as a Consenting Shareholder who voted to remove Mr. Goodman and Dr. Orza, "without cause" as directors of Broadcaster and the reasoning behind his decision; (2) his opinion of Mr. Goodman's business judgment and experience, or lack thereof, in managing companies in the media industry in connection with Mr. Goodman's performance as a director of Broadcaster; (3) his interactions with Mr. Goodman prior to the execution of the written consent; (4) his conversations with Mr. Goodman and with other shareholders and the impact of these conversations on his decision to vote to remove Mr. Goodman as a director of Broadcaster; (5) the alleged conspiracy between Defendants Martin Wade, Blair Mills, Nolan Quan and himself to remove Mr. Goodman as a director, in order to seize control of Defendant Broadcaster; (6) the statements in Broadcaster's 14C Information Statement and the amendments thereto as an accurate depiction of the

Consenting Shareholders' opinion of Mr. Goodman as a director of Broadcaster; (7) the publication in Broadcaster's 14C Information Statement and the amendments hereto of allegedly defamatory statements as an alleged retaliation against Mr. Goodman for disclosing the waste and fraudulent conversion of corporate funds by Defendants Martin Wade, Nolan Quan, Blair Mills and Andrew Garroni; (8) the allegedly malicious filing of allegedly knowingly false and defamatory statements regarding Mr. Goodman; (9) his knowledge of and relationship to, if any, to Longview, Pacificon, Binary, Frostham and Quan; (10) whether he has ever been employed by Broadcaster, or served as its purported "shareholder representative" (he did not); (11) the nature of the FTC proceedings, the allegations raised therein, and the settlement thereof; and (12) the alleged related-party transactions between Broadcaster and Longview and Frostham, and the services provided by these companies in exchange for payment from Broadcaster; and Quan's relationship, if any, to Longview and/or Frostham.

c.    Defendant Blair Mills, a resident of Los Angeles, California, and Broadcaster's Chief Financial Officer, is expected to testify as to, among other things: (1) his interactions with Goodman; (2) his opinion of Mr. Goodman's business judgment and experience, or lack thereof, in managing companies in the media industry in connection with Mr. Goodman's performance as a director of Broadcaster; (3) his conversations with any shareholders regarding Mr. Goodman's performance as a director of Broadcaster; (4) the alleged conspiracy between Defendants Martin Wade, Nolan Quan, Andrew Garroni and himself to remove Mr. Goodman as a director, in order, to seize control of Defendant Broadcaster; (5) statements in Broadcaster's 14C Information Statement and the amendments thereto; (6) the publication in Broadcaster's 14C Information Statement and the amendments thereto of allegedly defamatory statements as an alleged retaliation against Mr. Goodman for disclosing the waste and fraudulent conversion of corporate funds by Defendants Martin Wade, Nolan Quan, Blair Mills and Andrew Garroni; (7) the allegedly malicious filing of allegedly knowingly false and defamatory statements regarding Mr. Goodman; (8) his employment by or other relationship, if any, with Defendants, Broadcaster, Longview and Alchemy; (9) the purported related-party transactions

complained of in the Complaint; and (10) financial matters concerning Broadcaster raised in the Complaint, as well as the regulatory disclosures made in connection therewith.

d.     Sanger Robinson, a defendant in the <u>Baytree</u> action and a resident of Los Angeles, California, is expected to testify both individually and in connection with his role with Defendant Broadcaster Interactive Group, Inc. as to: (1) his employment or other relationship, if any, with Defendant Broadcaster and Broadcaster Interactive Group, Inc.; (2) his knowledge and involvement, if any, and/or the knowledge or involvement of Defendants Quan or Gould in regard to the alleged related-party transactions between Broadcaster and Alchemy F/X or Broadcaster LLC; and (3) his knowledge, if any, of the services provided to Broadcaster by Alchemy F/X and Broadcaster LLC.

e.     Robert Gould, a defendant in the <u>Baytree</u> action and a resident of Los Angeles, California, is expected to testify as to: (1) his employment or other relationship, if any, with Defendant Broadcaster; (2) his employment, if any, with Longview and BIG Inc., and/or any purported business venture with Defendant Quan; (3) his knowledge and involvement, if any, and/or the knowledge or involvement of Defendants Quan or Robinson, in regard to the alleged related-party transactions between Broadcaster and Alchemy F/X or Broadcaster LLC; (4) his knowledge of the services provided to Broadcaster by Alchemy F/X and Broadcaster LLC; his knowledge concerning the practice of the purchase of traffic.

f.     Jason Brazell, a defendant in the <u>Baytree</u> action and a resident of Los Angeles, California, is expected to testify as to: (1) the fact that he was never employed by Defendant Broadcaster, contrary to plaintiffs' allegations; (2) his employment or other relationship with Frostham; (3) the nature of the FTC proceedings; the truth or falsity of the allegations raised therein; the settlement of the FTC action, Baytree's advocacy thereof, and Broadcaster's payment thereof in accordance with contractual indemnification provisions with certain FTC Defendants; and (4) the alleged related-

party transactions between Broadcaster and Frostham, and the services provided by Frostham.

g.     Peter Wang of Los Angeles, California, former Vice President of Traffic Analysis of Broadcaster, is expected to testify as to issues concerning number and calculation of visitors and or traffic to the Broadcaster.com web site, and the reporting of such facts to the Broadcaster Board of Directors and management.

h.     Choi, Kim & Park, LLP, of Los Angeles, California, the auditors to Broadcaster are expected to testify as to Broadcaster's financial reporting and disclosures, including the reporting and disclosure of alleged interested-party transactions.

i.     A representative of Google Analytics, of Mountain View, California, is expected to testify as to the number of "unique users" visited the Broadcaster.com web site.

j.     A representative of Value Click Media, of Westlake Village, California, and other similarly situated service providers, are expected to testify as to advertising-related services provided to Broadcaster, and payments for said services made by Frostham on Broadcaster's behalf.

## Other Material Witnesses Are Located Outside of California, But Not in New York

k.     Defendant Martin Wade of New Jersey, Broadcaster's Chief Executive Officer is expected to testify as to, among other things: (1) his opinion of Mr. Goodman's business judgment and the basis upon which said opinion was formed, and Mr. Goodman's experience, or lack thereof, in managing companies in the media industry in connection with Mr. Goodman's performance as a director of Broadcaster; (2) his interactions with Mr. Goodman prior to the execution of the written consent; (3) his conversations with any shareholders regarding Mr. Goodman's performance as a director of Broadcaster; (4) Mr. Goodman's financial ties to Michael Gardner and Mr. Goodman's lack of independence; (4) the alleged conspiracy between Defendants Nolan Quan, Blair Mills, Andrew Garroni and himself to remove Mr. Goodman as a

director, in order, to seize control of Defendant Broadcaster; (5) the publication in Broadcaster's 14C Information Statement and the amendments thereto of allegedly defamatory statements in alleged retaliation against Mr. Goodman for disclosing the waste and fraudulent conversion of corporate funds by Defendants Martin Wade, Nolan Quan, Blair Mills and Andrew Garroni; (6) the allegedly malicious filing of allegedly knowingly false and defamatory statements regarding Mr. Goodman; (7) his employment or other relationship with Defendant Broadcaster; (8) the proposed but then aborted JamNow transaction, and the alleged related-party transactions between Broadcaster and Quan and/or the Board Defendants; (9) the services provided by outside companies in exchange for payment by Broadcaster; (10) his relationship, if any, to these companies; (11) the approval of the subject transactions by Broadcaster and/or the Board Defendants; (12) Broadcaster's securities disclosures and/or other public statements in regard to the transaction; (13) Broadcaster's retention of outside counsel to conduct an independent investigation of these purported related-party transaction; (14) the insufficiency of Nominal-Plaintiff's demand for corporate action and/or the purported futility of such a demand; and the composition of Broadcaster's Board of Directors, including independent directors; (15) the reporting and calculation of "unique visitors" to the Broadcaster.com website; the services provided by Alchemy in regard thereto; (16) Broadcaster's securities disclosures and/or other public statements concerning such web traffic; (17) certain Broadcaster expenditures; (18) Quan's compensation package and the re-negotiation and amendment thereof, as well as the entitlement of Quan and Gardner of the "Earn Out Shares;" the issuance of shares to other parties based upon web traffic formula; (19) the operations of Broadcaster as well as the governance of the Company by its management and Board of Directors.

l.      Richard Berman of Connecticut, a member of the Broadcaster Board of Directors and its Audit Committee chairman, is expected to testify as to, among other things: (1) his relationship with Defendant Broadcaster and activities on its behalf; (2) his knowledge, if any, of the alleged related-party transactions between Broadcaster and Quan and/or the Board Defendants; (3) his knowledge, if any, of the services provided by outside companies in exchange for payment by Broadcaster; (4) his

relationship, if any, to these companies; (5) his knowledge, if any, of the approval of the subject transactions by Broadcaster and/or the Board Defendants; (6) Broadcaster's securities disclosures and/or other public statements in regard to the transaction; (7) Broadcaster's retention of outside counsel to conduct an independent investigation of these purported related-party transaction; (8) the insufficiency of Nominal-Plaintiff's demand for corporate action and/or the purported futility of such a demand; and the composition of Broadcaster's Board of Directors, including the activities and roles of the independent directors; (9) the operations of Broadcaster as well as the governance of the Company by its management and Board of Directors.

m.    Sean Deson, of Las Vegas, Nevada, former Chairman of the Broadcaster Board of Directors, is expected to testify as to: (1) his role as a representative of a Consenting Shareholder who voted to remove Mr. Goodman and Dr. Orza, "without cause," as directors of Broadcaster and the reasoning behind his decision; (2) his employment or other relationship with Defendant Broadcaster, Baytree and Michael Gardner, and as a representative of a Consenting Shareholder; (3) his participation and/or other attendance at the Broadcaster Board meetings as well as the matters addressed therein, including but not limited to the appointment of certain independent directors, the corporate decision to pursue a public AMEX listing, and the issuance of certain shares of the company; (4) the entitlement of Quan and Gardner of the "Earn Out Shares" and/or the issuance of shares to other parties based upon web traffic formula, and the Board's approval thereof; and (5) Mr. Deson's experience with Goodman and Gardner in other publicly traded companies and Gardner's modus operandi of seeking to obtain control over such companies through false allegations of wrongdoing against management and then through vexatious litigation based on such allegations.

n.    Robert Falcone of Portland, Oregon, former member of the Broadcaster Board of Directors and Chairman and member of the Audit Committee of the Board of Directors of IMSI, is expected to testify as to: (1) his employment or other relationship with Defendant Broadcaster; (2) the FTC proceedings; the truth or falsity of the allegations raised therein and its settlement; (3) Broadcaster's securities

disclosures and/or other public statements; and (4) the operations of Broadcaster as well as the governance of the Company by its management and Board of Directors.

o.    Michael Harris, Esq. of Florida, former securities counsel to Broadcaster, is expected to testify as to: (1) certain of Broadcaster's securities disclosures and/or other public statements; (2) his review of related-party transactions and the disclosure thereof, (3) the alleged interested-party transactions and the disclosure thereof by Broadcaster.

p.    Vincent Orza of Oklahoma, a former member of the Broadcaster Board of Directors, is expected to testify as to: (1) the allegedly defamatory statements in Broadcaster's 14C Information Statement and amendments thereto and the related underlying events; (2) the allegedly defamatory statements in Martin Wade's letter in response to Dr. Orza's letter and the related underlying events, including Dr. Orza's letter; (3) the termination of certain directors and the disclosure and reporting thereof; and (4) his close financial ties to Michael Gardner, who both manages his personal funds and oversees his work as a business dean at Oklahoma City University.

q.    A representative of Ad On Network, of Phoenix, Arizona, is expected to testify as to advertising-related services provided to Broadcaster, and payments for said services made by Frostham on Broadcaster's behalf.

Party and Non-Party Witness With Ties to New York

r.    Defendant Gary Herman of New York, a Consenting Shareholder of Broadcaster, is expected to testify as to: (1) his role as a Consenting Shareholder who voted to remove Mr. Goodman and Dr. Orza "without cause" as directors of Broadcaster and the reasoning behind his decision; (2) his opinion of Mr. Goodman's business judgment and experience, or lack thereof, in managing companies in the media industry, in connection with Mr. Goodman's performance as a director of Broadcaster; (3) his negative interactions with Mr. Goodman prior to the execution of the written consent; (4) his conversations with Mr. Goodman and with other shareholders and the impact of these conversations on his decision to vote to remove

Mr. Goodman as a director of Broadcaster; (5) the alleged conspiracy between Defendants Martin Wade, Blair Mills, Andrew Garroni and himself to remove Mr. Goodman to seize control of Defendant Broadcaster; (6) the statements in Broadcaster's 14C Information Statement and the amendments thereto as an accurate depiction of the Consenting Shareholders' opinion of Mr. Goodman as a director of Broadcaster; (7) the publication in Broadcaster's 14C Information Statement and the amendments thereto of allegedly defamatory statements in alleged retaliation against Mr. Goodman for disclosing the waste and fraudulent conversion of corporate funds by Defendants Martin Wade, Nolan Quan, Blair Mills and Andrew Garroni; and (8) the allegedly malicious filing of allegedly knowingly false and defamatory statements regarding Mr. Goodman.

s.    Leslie Marlow, Esq. of New York, current securities counsel to Broadcaster, is expected to testify as to: (1) Broadcaster's filing of the Schedule 14C Preliminary Information Statement on December 21, 2007, with the SEC, which disclosed that 58% of the shareholders ("Consenting Shareholders") had executed a written consent to remove Mr. Goodman and Dr. Orza as directors of Broadcaster; (2) the correspondence between Broadcaster and the SEC through which the SEC requested additional clarifications or disclosures in several subsequent amendments to Broadcaster's Schedule 14C Preliminary Information Statement; (3) the transactions and interactions with the SEC underlying the disclosures in the subsequent amendments to Broadcaster's Schedule 14C Preliminary Information Statement; and (4) the accuracy of the depiction, in the 14C Information Statements and amendments thereto, of the Consenting Shareholders' view of the business judgment and experience of Mr. Goodman in managing companies in the media industry, in connection with Goodman's performance as a director of Broadcaster.

t.    Plaintiff Paul Goodman, Esq. of New York, a terminated director of Broadcaster (whose removal is currently pending the resolution of certain issues in this action) is expected to testify as to: (1) the allegations set forth in his defamation Complaint in the Goodman action and affidavits, his personal knowledge, if any, of these allegations and/or the underlying actions; (2) the allegations set forth in the

Complaint in the <u>Goodman §720 v. Broadcaster</u> action, affidavits, and his personal knowledge thereof, if any

u.       Plaintiff Michael Gardner, of New York and Las Vegas, Nevada, and a principal of Baytree Capital Associates, LLC ["Baytree"] is expected to testify as to (1) the allegations set forth in his defamation Complaint in the <u>Gardner</u> action, and his personal knowledge thereof, if any; (2) his knowledge, if any, substantiating the allegations set forth in the <u>Baytree</u> Complaint and/or the factual basis supporting such allegations; and (3) that Gardner, given his publicly documented, disseminated and judicially reported conviction for federal securities violations and because of his past history and reputation, is a "libel-proof plaintiff" incapable of sustaining further damage to reputation.

14.      <u>Conclusion</u> -- As set forth above, and in the attached memorandum of law, all of the factors to be considered in determining whether to transfer an action pursuant to 28 U.S.C. § 1404(a) militate in favor of the transfer of this matter to the District Court for the Central District of California.  Given that all four related actions arise out of the same operative facts and two of the related actions have already been transferred, that the overwhelming majority of the material witnesses are present in California or capable of compulsion to testify there, and in the interests of judicial economy and efficiency, these actions should, if they are not dismissed with prejudice, be transferred.

I declare under penalties of perjury that the foregoing is true and correct.

Dated: New York, New York
       May 21 , 2008

MICHAEL ZWEIG

# EXHIBIT 1

**Exhibit 1:**    **Various Iterations of Broadcaster's 14C Information Statement and Amendments Thereto**

January 4, 2008 – Amendment No. 1 to Schedule 14C Information Statement[1]:

> On December 21, 2007, record holders of 29,777,137 shares of our Common Stock, representing approximately 58% of such Common Stock outstanding as of December 21, 2007, executed and delivered a written consent providing for the removal without cause of two directors, Dr. Vincent Orza and Paul Goodman from their positions on our Board of Directors. Although the removal of the two directors is being effected without cause, it is motivated by the shareholders' lack of confidence in the business judgment of the two directors being removed. Such lack of confidence is the result of recent conversations between the shareholders and the directors and the fact that based upon their biographies and conversations, neither Dr. Vincent Orza nor Paul Goodman has any prior experience in managing companies in the media industry.

Goodman Complaint at ¶ 18.

January 10, 2008 – Amendment No. 2 to Schedule 14C Information Statement:

> Although the removal of the two directors is being effected without cause, it is motivated by the shareholders' lack of confidence in the business judgment of the two directors being removed. Such lack of confidence is the result of recent conversations between the shareholders and the directors regarding how to shut down the Company's business operations in a manner that would preserve the value of the Company's assets and share price. The fact that, based upon their biographies and conversations, neither Dr. Vincent Orza nor Paul Goodman has any prior experience in managing companies in the media industry also contributed to such lack of confidence.

Goodman Complaint at ¶ 19.

January 11, 2008 – Amendment No. 3 to Schedule 14C Information Statement:

---

[1] Broadcaster filed the Preliminary Information Statement on Schedule 14C with the SEC on December 21, 2007.

> Although the removal of the two directors is being effected
> without cause, it is motivated by the shareholders' lack of
> confidence in the business judgment of the two directors
> being removed. Such lack of confidence is the result of
> recent conversations between the shareholders and the
> directors regarding how to shut down the Company's
> business operations in a manner that would preserve the
> value of the Company's assets and share price. The fact
> that, based upon their biographies and conversations,
> neither Dr. Vincent Orza nor Paul Goodman has any prior
> experience in managing companies in the media industry
> also contributed to such lack of confidence.

Goodman Complaint at ¶ 20.

**January 23, 2008 – Amendment No. 4 to Schedule 14C Information Statement:**

> On December 21, 2007, record holders of 29,777,137
> shares of our Common Stock, representing approximately
> 58% of such Common Stock outstanding as of December
> 21, 2007, executed and delivered a written consent
> providing for the removal without cause of two directors,
> Dr. Vincent Orza and Paul Goodman from their positions
> on our Board of Directors. Although the removal of the
> two directors is being effected without cause, the
> consenting shareholders have expressed a lack of
> confidence in the business judgment of the two directors
> being removed. Such lack of confidence is the result of
> recent conversations among certain consenting
> shareholders and the directors regarding how to shut down
> the Company's business operations in a manner that would
> preserve the value of the Company's assets and share price.
> In forming their judgment, the consenting shareholders
> considered that, based upon their biographies and the above
> referenced conversations, neither Dr. Vincent Orza nor
> Paul Goodman has any prior experience in managing
> companies in the media industry.

Goodman Complaint at ¶ 21.

**January 28, 2008 – Amendment No. 5 to Schedule 14C Information Statement:**

> On December 21, 2007, record holders of 29,777,137
> shares of our Common Stock, representing approximately

58% of such Common Stock outstanding as of December 21, 2007, executed and delivered a written consent providing for the removal without cause of two directors, Dr. Vincent Orza and Paul Goodman from their positions on our Board of Directors. By removing Dr. Orza and Mr. Goodman, two of the three independent directors currently on the Board of Directors will be removed. Although the removal of the two directors is being effected without cause, the consenting shareholders have expressed a lack of confidence in the business judgment of the two directors being removed. Such lack of confidence is the result of recent conversations among certain consenting shareholders and the directors regarding how to shut down the Company's business operations in a manner that would preserve the value of the Company's assets and share price. In forming their judgment, the consenting shareholders considered that, based upon their biographies and the above referenced conversations, neither Dr. Vincent Orza nor Paul Goodman has any prior experience in managing companies in the media industry.

Goodman Complaint at ¶ 22.

February 4, 2008 – Amendment No. 6 to Schedule 14C Information Statement:

On December 21, 2007, record holders of 29,777,137 shares of our Common Stock, representing approximately 58% of such Common Stock outstanding as of December 21, 2007, executed and delivered a written consent providing for the removal without cause of two directors, Dr. Vincent Orza and Paul Goodman from their positions on our Board of Directors. By removing Dr. Orza and Mr. Goodman, two of the independent directors currently on the Board of Directors will be removed; however, we have recently added two directors to our Board of Directors, both of whom are independent. Therefore, after such removal, three independent directors will remain on our Board of Directors. Although the removal of the two directors is being effected without cause, the consenting shareholders have expressed a lack of confidence in the business judgment of the two directors being removed. Such lack of confidence is the result of recent conversations among certain consenting shareholders and the directors regarding how to shut down the Company's business operations in a manner that would preserve the value of the Company's assets and share price. In forming their judgment, the

consenting shareholders considered that, based upon their biographies and the above referenced conversations, neither Dr. Vincent Orza nor Paul Goodman has any prior experience in managing companies in the media industry.

Goodman Complaint at ¶ 23.

# EXHIBIT 2

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-----------------------------------------------------------------X

PAUL GOODMAN,

                              Plaintiff,                    Index No.

          -against-

MARTIN WADE, NOLAN QUAN, BLAIR MILLS,         <u>Affidavit in Support</u>
BROADCASTER, INC., GARY HERMAN, BRUCE
GALLOWAY, THOMAS KIKIS, KIKIS FAMILY
FOUNDATION, WILLOW CREEK CAPITAL
MANAGEMENT, TRINAD CAPITAL MASTER
FUND, LTD., AARON BROWN, ANDREW GARRONI,
STRATEGIC TURNAROUND EQUITY PARTNERS, LP
(CAYMAN) AND DIGITAL CREATIVE DEVELOPMENT
CORPORATION,

                              Defendants.

-----------------------------------------------------------------X

STATE OF NEW YORK     )
                        ) ss:
COUNTY OF NEW YORK  )

       PAUL GOODMAN, being duly sworn, deposes and says:

       1.      I am the Plaintiff *pro se* in the above-captioned action and thus, familiar with the facts and circumstances herein.  I am also a member of the Board of Directors of Defendant Broadcaster, Inc., a Delaware corporation ("Broadcaster"). Broadcaster is a publicly traded corporation with its stock listed for quotation on the Over-the-Counter Bulletin Board ("OTCBB").

       2.      I make this affirmation in support of my Order to Show Cause seeking a temporary restraining order and preliminary injunction against the Defendants to prevent the Defendants from continuing to republish untrue and defamatory statements regarding

my business judgment and reputation in filings made by Broadcaster with the Securities and Exchange Commission ("SEC"). Unless stopped by this Court, Broadcaster will continue to damage my career and business reputation by continuing to publish revised versions of such documents and to mass mail them to its stockholders.

3.    This Order to Show Cause is being brought simultaneously with the commencement of this action by Summons With Notice, as attached hereto as Exhibit "A". The Summons With Notice alleges causes of action against the Defendants for defamation, defamation per se, prima facie tort, intentional infliction of emotional distress, negligence, injurious falsehood and tortious interference with prospective business relations.

4.    It should be made clear that I do not seek this relief to block the proposed corporate action. What I seek is an injunction to prevent the further publications and dissemination of false and damaging statements about myself in Securities and Exchange Commission filings made by the Defendants.

5.    Except as set forth herein, the Defendants herein (other than Broadcaster) are each stockholders of Broadcaster or individuals controlling such entities who executed a written consent of stockholders calling for my removal as a Director of Defendant Broadcaster. Defendant Wade is the Chief Executive Officer of Defendant Broadcaster. Defendant Quan is the President of Defendant Broadcaster and allegedly its largest shareholder. Defendant Mills is the Chief Executive Financial of Defendant Broadcaster.

2

6.    As will be shown, Defendant's damaging and false statements, have been repeatedly published by Broadcaster, in an attempt to retaliate against me and silence my objections to self-serving transactions engaged in by Defendant Quan.

This Court has Jurisdiction

7.    CPLR § 302(a)(3)(ii) provides that a court may exercise personal jurisdiction over any non-domiciliary, or his executor or administrator, who in person or through an agent ... commits a tortious act without the state causing injury to person or property within the state, except as to a cause of action for defamation of character arising from the act, if he ... expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce.

8.    On May 9, 2007, I was elected to the Board of Directors of Broadcaster at its annual meeting of stockholders. I had been nominated to the Board of Directors by Defendant Wade due to my experience as both a securities lawyer and my extensive background in working with small Internet companies such as Broadcaster. In fact, over the past 12 years, I have represented and worked closely with over 50 companies involved in the Web industry ranging from small start-up companies to publicly traded companies. In addition, I hold both a Bachelors and Masters Degree in Computer Science and have been on the computer science faculty of several colleges. During the annual stockholders meeting, Defendant Quan voted all of his shares in favor of my election to the Board of Directors, based upon my experience in the Web industry and my biography.

9.     In addition, I am one of five trustees of a trust which currently holds approximately 1,600,000 shares of Broadcaster common stock. This stock was acquired in connection with an unrelated corporate transaction in 2004, in which Broadcaster (the known as International Microcomputer Software, Inc.) acquired a subsidiary of an unrelated company of which I coincidently was a director.

10.     From the time that I was elected to the Board of Directors, I became a vocal critic of Broadcaster's business model and management's inability to reduce costs and create a competitive business.

11.     Recently and more seriously, I have discovered what appear to be a series of transactions in which Broadcaster paid large sums to entities which appear to be secretly owned and/or controlled by management.

12.     As will be shown herein, Defendants' defamatory acts have been taken against me as a means of retaliating against my criticism of management and for disclosing this self-dealing transactions involving Defendant Quan and Defendant Broadcaster.

13.     In order to obtain temporary injunctive relief, a movant must demonstrate (1) a likelihood of ultimate success on the merits, (2) irreparable injury absent a granting of the injunction, and (3) a balancing of the equities in the movant's favor (*Barone v. Frie*, 99 A.D.2d 129, 132, 472 N.Y.S.2d 119; *Albini v. Solork Assoc.*, 37 A.D.2d 835, 326 N.Y.S.2d 150; *See*, CPLR 6301).

14.     It is respectfully submitted that I shall be sufficiently demonstrate each such requirement herein.

4

<u>Background History</u>

15.     A brief history of Broadcaster will provide the Court with the context

necessary to understand the necessity of this application.

A.  Broadcaster, in its current state, was created on June 2, 2006, when a
company then known as International Microcomputer Software, Inc. ("IMSI")
acquired a group of companies owned and/or controlled by Defendant Nolan
Quan known as "AccessMedia".  IMSI then changed its name to "Broadcaster,
Inc." to reflect its new business.

B.  At such time, AccessMedia provided subscription-based entertainment
videos over the Web.  Although I was not involved in the acquisition, it was
apparently unknown to the company's management that the business tactics
employed by Mr. Quan's companies to acquire subscribers were under
investigation by the Federal Trade Commission ("FTC") and involved several
practices determined by the FTC to be unlawful including secretly downloading
"spyware software" on to consumer's computers and using extortionate tactics to
getting consumers to pay fees to the company.

C.  However, by 2006, it was already well established that charging for
content on the Internet was not a viable business concept  and it became clear that
the Broadcaster had to quickly adopt a new business model.

D.  On or about December 7, 2006, Broadcaster changed it business model
by dropping its dubious subscription-based business and re-launching as a video
Web site that was similar to the famous YouTube Web site.

E.  Although the Chief Executive Office of Broadcaster was and is
currently Defendant Martin Wade, the company was actually managed by
Defendant Quan at its offices in Chatsworth, CA.  Defendant Wade remained an
East coast resident mostly working out of an office provided to Broadcaster by its
investment banker at 40 Wall Street, New York, NY.

F.  Even with a new business model, Broadcaster continued to employ
dubious business tactics.  Instead of trying to promote the Broadcaster.com
through normal promotional channels such as doing joint ventures with other
companies Web companies, Defendant Quan employed a questionable practice of
"purchasing Web traffic".  In actuality, what Defendant Quan did was to use an
affiliated entity to activate existing "spyware" software (which they had for many
years tricked consumers into downloading) to make the Broadcaster.com Web site
automatically appear on the computers of unwitting consumers.

5

G. Thus, an unwitting computer user might be searching with Google or Yahoo and without any action on their part, the Broadcaster.com home page appeared. When this happened, over 99% of such users simply either ignored the Broadcaster.com home page or instantly closed it.

H. As can be seen by Exhibit "B", this promotional tactic was poorly received by computer users who were often annoyed and dismayed by having the Broadcaster.com Web site appear on their computers. Many computer users believed Broadcaster.com to be a computer virus and as can be seen from the Exhibit literally begged others for help in removing it. In addition, each time the spyware was kicked into action on a user's computer, the Company's web servers recorded what was essentially a "phantom" page view, that is, one that was not requested by a user and which over 99% was literally ignored.

I. The costs to Broadcaster for this were tremendous. For the 12 month period ending June 30, 2007, Broadcaster paid over $6 million for this "traffic generation". It now seems that this money was paid to one or more entities which were housed within Broadcaster's California offices and secretly owned and/or controlled by Defendant Quan and possibly other long time business associates of Defendant Quan. In fact, according to the FTC, these entities and Broadcaster were a "common enterprise"[1].

J. Although the phantom page views provided little or no benefit to Broadcaster, they were of great value to Defendant Quan who used them to claim a right to receive an additional 7,000,000 shares of Broadcaster stock and making himself the largest stockholder of Broadcaster.

The Defamatory Statements

16.    All throughout this time, Defendant Wade, even though he was CEO of

Broadcaster, failed to take any action to curtail the misdeeds and self dealing of

Defendant Quan. As a result of Defendants Quan and Wade's mismanagement and

apparent self-dealing, Broadcaster showed an operating loss of over $16 million for the

year ending June 30, 2007 and an operating loss of over $3.1million for the three months

ending September 30, 2007. Thus, as recently as September, 2007, Broadcaster was

---

[1] In fact, the company was sued by the FTC and paid over $500,000 to settle the FTC's allegations.

<u>losing over $1 million per month.</u> Despite these huge, continuing losses, management, led by Defendants Wade and Quan, made no attempts to curtail spending.

17.     It should be noted that during the same period of time, Broadcaster received very little revenue from its advertising business model and the huge losses which continued to mount threatened the viability of the company's survival. Also, as a result of the huge operating losses, during that period of time, Broadcaster's stock price dropped over 90%.

18.     As would any responsible Director, myself and another Director, Dr, Vincent Orza, demanded that management take immediate and drastic steps to stop the pointless spending of additional cash for a failed business.

19.     Each complaint was met by disinterest and distain by Defendant's Wade, Quan and Mills.

20.     It then escalated to Defendants Wade, Quan and Mills purposefully ignoring Board of Directors resolutions requiring the termination of the company's operating business and laying off all staff.  It should be noted that even without any revenue, Broadcaster continued to employ Defendant Quan's wife and son in unnecessary positions.

21.     Specifically, at two Board meetings conducted on November 26, 2007 and November 27, 2007, the Board voted to terminate all employees and yet, Defendant's Wade, Quan and Mills refused to comply.  At the same meetings, the Board voted to pursue other business opportunities for the company.

22.     Then, at a meeting in December 13, 2007, when the Board authorized the execution of a letter of intent for the acquisition of a company called "JamNow", the

Defendants' true intentions became clear. Not wanting to see the Company acquire JamNow and the simultaneous termination of its current business, Defendant Quan improperly instructed the CEO, Defendant Wade, to present to the Board yet another potential acquisition, a Web hosting company known as "WebHost4Life." WebHost4Life is a company which is a significant client of one of Defendant Quan's private ventures known as "Alchemy Communications".

23.    In order to continue their scheme, Defendants Wade, Quan and Mills solicited other stockholders of Broadcaster to remove myself and Dr. Orza as Directors of Broadcaster, allegedly, "not for cause".

24.    The group of stockholders organized by Defendants Wade, Quan and Mills purportedly constitute a majority and on or about December 21, 2007, each executed a written consent to remove myself and Dr. Orza from the Board of Directors (the "Written Consent")(Exhibit "C"). Simultaneously, Defendant Wade, acting without the Board of Director's knowledge or consent, withdrew the executed JamNow letter of intent.

25.    However, in order to effectuate such removal, the Defendants have to comply with the requirements of Section 14 of the Securities Act of 1934, as amended (the '34 Act").  Section 14 requires that no stockholder action can be taken until:

(a)  A preliminary "Information Statement" properly disclosing the action to be taken has been provided to the Securities and Exchange Commission ("SEC") for review and posted to the SEC's publicly available EDGAR system.  The SEC then has a 10-day period to review the document and request that changes be made and amendments be posted to EDGAR.

8

(b) Then, once approved by the SEC staff, a definitive Information Statement has to be posted to EDGAR and mailed to each of the Stockholders.

(c) Finally, twenty days after mailing, the action can finally be taken.

26.     Defendant Wade, acting on behalf of Broadcaster, was none to happy to help the other Defendants.  Even though Broadcaster is not an party to the attempt to remove myself and Dr. Orza, he fired Broadcaster's outside corporate counsel and then hired a new law firm, at Broadcaster's sole expense, to prepare and file the Information Statement on behalf of the other Defendants.

27.     This Information Statement is the gravamen of this action.

28.     Late in the afternoon of Friday, December 21, 2007, Defendant Wade caused Defendant Broadcaster to file a preliminary Information Statement on the SEC's EDGAR Web site. A complete copy is attached hereto as Exhibit "D".  The Information Statement contained the following description of the action being taken:

> On December 21, 2007, record holders of 29,777,137 shares of our Common Stock, representing approximately 58% of such Common Stock outstanding as of December 21, 2007, executed and delivered a written consent providing for the removal without cause of two directors, Dr. Vincent Orza and Paul Goodman  from their positions on our Board of Directors.  A copy of the written consent of the majority stockholders is attached as Annex A to this Information Statement.

29.     It must be noted that everything posted to the EDGAR system is available to any user of the Web and is indexed by Google, Yahoo and the other search engines.

30.     Apparently, the SEC's Corporation Finance staff was not satisfied with the level of disclosure in the December 21, 2007 preliminary Information Statement, and

Broadcaster amended the Information Statement to explain the basis of the removal[2]. <u>This is where Broadcaster and the other Defendants went from filing just a perfunctory document to publishing defamatory statements.</u>

31.    On January 4, 2008, Defendant Wade caused Broadcaster to publish an amendment to the preliminary Information Statement (Exhibit "E") (the "First Amendment"), which adds the first instance of <u>false and defamatory statements</u>. In pertinent part, it states:

> On December 21, 2007, record holders of 29,777,137 shares of our Common Stock, representing approximately 58% of such Common Stock outstanding as of December 21, 2007, executed and delivered a written consent providing for the removal without cause of two directors, Dr. Vincent Orza and Paul Goodman from their positions on our Board of Directors. <u>Although the removal of the two directors is being effected without cause, it is motivated by the shareholders' lack of confidence in the business judgment of the two directors being removed. Such lack of confidence is the result of recent conversations between the shareholders and the directors and the fact that based upon their biographies and conversations, neither Dr. Vincent Orza nor Paul Goodman has any prior experience in managing companies in the media industry.</u> A copy of the written consent of the majority stockholders is attached as Annex A to this Information Statement. (emphasis added to show language added)

32.    It is respectfully submitted that the statements underlined above are <u>untrue, defamatory and published with malice.</u>  Apparently, the SEC's Corporation Finance staff was <u>still</u> not satisfied with the level of disclosure in the Information Statement, and so, <u>once again</u>, Defendant Wade, on January 9, 2008, caused Broadcaster to compound its improper and defamatory acts by publishing yet another Amendment to

---

[2] The exact comments made by the SEC to Broadcaster from SEC Corporation Finance staff issues in a comment letter is unknown and has not been publicly disseminated by the SEC.

the preliminary Information Statement (Exhibit "F") (the "Second Amendment"), which

furthers the falsehoods and states, in pertinent part:

> Although the removal of the two directors is being effected without cause,
> it is motivated by the shareholders' lack of confidence in the business
> judgment of the two directors being removed. Such lack of confidence is
> the result of recent conversations between the shareholders and the
> directors regarding how to shut down the Company's business operations
> in a manner that would preserve the value of the Company's assets and
> share price. The fact that, based upon their biographies and conversations,
> neither Dr. Vincent Orza nor Paul Goodman has any prior experience in
> managing companies in the media industry also contributed to such lack of
> confidence . A copy of the written consent of the majority stockholders is
> attached as Annex A to this Information Statement. (emphasis added to
> show language added).

33.    This then continued yet one more time on January 11, 2008, when

Defendant Wade, once again caused Broadcaster to compound its improper and

defamatory acts,  this time ratcheting up the personal attacks, by publishing yet another

amendment to the preliminary Information Statement (See Exhibit "G") (the "Third

Amendment"), which states:

> Although the removal of the two directors is being effected without cause,
> it is motivated by the shareholders' lack of confidence in the business
> judgment of the two directors being removed. Such lack of confidence is
> the result of recent conversations between the shareholders and the
> directors regarding how to shut down the Company's business operations
> in a manner that would preserve the value of the Company's assets and
> share price. The fact that, based upon their biographies and conversations,
> neither Dr. Vincent Orza nor Paul Goodman has any prior experience in
> managing companies in the media industry also contributed to such lack of
> confidence. There were three meetings of the Board of Directors that were
> held by the Company by telephonic conference (November 26th,
> December 3rd and 13th, 2007) at which the manner of the shut down was
> discussed. Messrs. Wade, Berman, Mills and Goodman were present at
> each meeting. Dr. Orza was present at two of those meetings. At each
> meeting several non board members were present by invitation.

11

Messrs. Quan, Harris and Gardner were present by invitation at all three
meetings and Mr. Herman was present by invitation at the December 13,
2007 meeting. At each meeting there was a disagreement about the how to
deal with terminating employees and how to preserve the value of the
assets. On December 13, 2007 the Board resolved to dismiss most of the
employees by December 31, 2007 and such action has been implemented.
A copy of the written consent of the majority stockholders is attached as
Annex A to this Information Statement. Listed below is the name of each
such consenting shareholder, the number of shares held by each such
consenting shareholder and the percentage of beneficial ownership of the
Company's common stock held by such consenting shareholder.
(emphasis added to show language added).

34.     Defendants have now, three times, published and publicly disseminated

damaging defamatory statements which are just plain false.  It is respectfully submitted

that without an order from this Court stopping such further publication of defamatory

statements, the Defendants will continue to compound their acts at least twice more, in

both electronic form and in print, and continue to permanently damage my reputation and

career.

35.     The elements of defamation are a false statement, published without

privilege or authorization to a third party, constituting fault as judged by, at a minimum, a

negligence standard, and it must either cause special harm or constitute defamation per

se" (*Dillon v. City of New York*, 261 A.D.2d 34, 38 (1999) ). It is well settled that a

defamatory statement is defamation per se if it imputes fraud, dishonesty, misconduct, or

unfitness in conducting one's profession". It is also well established that words constitute

defamation per se if they affect the plaintiff in his trade, occupation, or profession"

(*Sterling Doubleday Enterprises, L.P. v. Marro*, 238 A.D.2d 502, 503 (1997); *Warlock*

*Enterprises v. City Center Assocs.*, 204 A.D.2d 438, 438 (1994)).

36.    An action in defamation per se may be maintained when a publication is defamatory upon its face while an action premised upon libel innuendo, which requires special damages, is necessary when the publication requires extrinsic evidence to explain its defamatory meaning" (*Luisi v. JWT Group, Inc.* 128 Misc.2d 291, 294 (1985), *affd* 67 N.Y.2d 914 (1986)).

37.    Stated differently, the alleged defamatory words must be "construed in the context of the entire statement or publication as a whole, tested against the understanding of the average reader, as opposed to having a forced, artificial construction imposed upon them" (*Porter v. Saar*, 260 A.D.2d 165, 167 (1999)). Statements which are not defamatory on their face may in fact be defamatory because of the use of innuendo. (*WDM Planning, Inc. v. United Credit Corp.*, 47 N.Y.2d 50, 53 (1979)).

38.    It is respectfully submitted that I can show each element required to grant this request for a temporary restraining order and preliminary injunction.

<u>The Statements are False – The Cited Conversations Never Took Place</u>

39.    The statements made in each of the three Amendments each assert that the Defendants have come to conclusions regarding the business judgment of myself based my biography and upon conversations I have had with each of the Defendant stockholders which has given them a basis to come to a conclusion about my business judgment and qualifications.

40.    There is a likelihood of success on the merits that I can show the falsity of these statements.  In fact, an analysis of whether the statements constitute truth or opinion is not even necessary <u>since the entire alleged factual basis of such statements never occurred</u>.

41.    Each of the Amendments to the Information Statement asserts that conversations have taken place between the "shareholders" meaning the 14 stockholders who signed the Written Consent, and myself.

42.    No such conversations have ever taken place making Defendants' statements entirely false.

43.    While the Third Amendment notes that one of the signatories of the written consent (which was Defendant Gary Herman) attended, a Board of Directors meeting, by telephone, my short conversation with him involved his right to be present at the meeting.  I had no discussion of the business of Broadcaster with Defendant Herman. It should be noted that this attempt to modify the statements in the Third Amendment does not eliminate the falsity of the statement nor does it decrease the damage caused by all three Amendments.

44.    In actuality, I have never spoken to some of the signatories of the Written Consent, including Bruce Galloway, Aaron Brown, Robert Ellin, Andrew Garroni and Thomas Kikis.  In fact, prior to receiving a copy of the Written Consent, I had never heard of several of those individuals, namely, Robert Ellin, Aaron Brown and Thomas Kikis.

45.    Yet, Defendant Wade, knowing that these conversations never took place, executed each of the three Amendments and published them.

46.    Then, compounding this falsehood, in cagey fashion, the Third Amendment to the Information Statement states "At each meeting there was a disagreement about the how to deal with terminating employees and how to preserve the

14

value of the assets" as if to suggest that a series of conversations took place between myself and all of the other stockholder were present.

47.     While there were disagreements at the Board meetings, Defendants characterizations are completely inaccurate.  While, Defendant Quan was present at some or all of such meetings as an observer, the discussions were between the five Directors of Broadcaster and not among myself and the Defendant stockholders.  In addition, the discussions did not "deal" with the best way to terminate employees.  In fact, the discussions dealt with my vote against Defendant Quan's proposal that Broadcaster become an offshore Internet porn Web business and disagreements with Defendant Wade for his refusal to terminate Broadcaster's employees after a 4 to 1 vote of the Board of Directors to do so (with Defendant Wade himself voting in favor of such termination of employees).  Additionally, it is important to note that such attempts to explain the basis of the statements made in the Third Amendment do not eliminate or minimize the defamatory nature of the statements contained in the First and Second Amendments which remain permanently available on the EDGAR system.

48.     Thus, the thrice repeated, published statements alleging my lack of experience and business judgment, purportedly determined based upon discussions between myself and the Defendant stockholders is patently false, and such falsity was known to each of the Defendants[3].

49.     It should be noted that even though each Amendment attempts to add further (and untrue) explanations of their acts, the earlier versions of the Information

---

[3] It should be noted that Defendant Wade, who is a Director, is named in this action since he caused the publication of the Information Statements.  He is not a party to the Written Consent.

Statement with their defamatory content remain permanently displayed and available on the SEC's EDGAR Web site.

50.    Furthermore, as a securities attorney, I regularly prepare and file documents on EDGAR and I have read the documents filed by 100s of other companies. This is the first time I have ever seen a personal attack in an EDGAR filing.

51.    Thus, each publication of the Information Statement and its Amendments constitutes a separate defamatory act and has an additive effect of increasing the damage to myself, my reputation and my career.

The Statements Imply Experience by the Other Directors

52.    By implication, the statements contained in the three Amendments imply experience managing a "media" company on the part of the three other Directors as a basis of comparison between myself (and Dr. Orza) and the other directors. By innuendo, the Defendants intend to make the public believe that the other three directors are more qualified than I am. In fact, none of the three other Directors have any such relevant experience.

53.    First, it is important to note that Broadcaster is not a media company. In fact, it is merely a Web site company similar to YouTube[4]. In fact, a visit to www.broadcaster.com will show the poor job done by management in developing a Web business.

54.    Furthermore, none of the three other Directors has any prior experience in managing media or an Internet company except (a) for some financial management roles performed by Defendant Mills in prior Internet pornography businesses operated by

---

[4] The term "media company" connotes companies such as NBC, CBS and the New York Times Company which create and distribute original content.

Defendant Quan and (b) Defendant Wade's experience with a former subsidiary which sold clip art over the Internet.

55.    This is as compared to Dr. Orza who was the CEO of a NASDAQ company for over twenty years, has run for the Governorship of Oklahoma and is the Dean of a business school.

56.    It is important to note that I was nominated for the Board of Directors by Defendant Wade himself and that Defendants Quan, Wade, Herman and Galloway voted in favor of my election to the Board based upon the exact same biography they now claim is insufficient to allow me to serve on the Board. This makes Defendant Wade and Quan's not only false but completely inconsistent with their past action.

The Statements are Damaging *Per Se*

57.    As an attorney, I will only have to show defamation *per se* and not have to establish actual damages to sustain an action against the Defendants.

58.    It is respectfully submitted that the statements published by the Defendants regarding my business judgment constitute defamation *per se* both directly and by innuendo.

59.    As a corporate and securities attorney, I am retained by clients to offer business and legal advice to them. The publishing of the Defendant's false statements are a direct and immediate threat to my business reputation and my ability to retain and find clients.

60.    Any existing or potential client researching myself on Google or Yahoo will easily uncover three separate documents in which my business judgment and reputation are falsely questioned and maligned.

17

61.    It is important to note that each additional publication of such false statements amplifies the incalculable damage I am, and will in the future, suffer because of Defendants' malicious and defamatory attacks on myself.

62.    It is also important to note that once posted to EDGAR, the documents containing the false and defamatory statements are permanent and can never be removed.

63.    Furthermore, since document published on EDGAR are in the public domain, there are numerous Web sites which republish those documents, examples of which are FreeEdgar.com and EdgarOnline.com. Thus, each publication is further compounded many times, making it more likely to be given heavy weight by the search engines.

64.    In order to comply with SEC regulations, the Defendant will have to publish the Information at least one more time and then also mail a copy to each of Broadcaster's stockholders. This will further irreparably damage my reputation and my career.

65.    I would also like to point out that I sit on the Board of three other publicly traded companies and the Defendants statements make it highly unlike that I will ever be selected again to be elected to a Board of Directors.

## The Statements Were Made With Malice

66.    There can be no question as to the malicious intent of the Defendants who want me removed so that they can complete yet one more self-serving insider transaction without my vocal objections.

67.    In addition, the Third Amendment, which is the most vociferous, was posted the day after I presented the Board of Directors with a 50-page document detailing undisclosed insider transactions at Broadcaster.

## I Face Irreparable Harm

68.    As previously stated, as additional versions of the Information Statement are posted to EDGAR there is an additive effect and the damage to my reputation and career will continue to expand and multiply since it makes it all the more likely that a search engine will display the Information Statements.

69.    Since I will never be able to determine how many clients do not hire myself or my firm because of these defamatory statements, I can never be compensated monetarily.

70.    This it is respectfully submitted that further irreparable harm will occur if the Defendants are not stopped from continuing to publish the defamatory statements.

## A Balancing of the Equities Favors Plaintiff

71.    When balancing the equities, it is apparent that they weigh heavily in favor of granting the relief requested to the Plaintiff.

72.    The continued damage I am suffering has already been shown herein. While, at the same time, the Defendants have no inalienable right to publish false statements in order to achieve their goals.

73.    It is the Defendants that have chosen to include in the Information Statements the clearly defamatory language and then republish it over and over. whatever they please out of malice and to retaliate.

74.    Importantly, I am not requesting that the Defendants be blocked from taking corporate actions. Rather, this application just seeks that no false and defamatory statements be included in further documents published by the Defendants.

75.    In fact, no prejudice will come to Defendant since the requested relief merely requires that they do not further publish any untrue statements contained in the first three Amendments.

76.    Therefore, the balance of equities clearly weighs in favor of the Plaintiff.

77.    There has been no prior request made for this relief.

WHEREFORE, I respectfully request that the Order to Show Cause be granted in its entirety, together with such other and further relief as this Court deems just and proper.

_____
                                    PAUL GOODMAN

Sworn to before me this
15th day of January, 2008

_____
Notary Public

ALFONSO DeCICCO
Notary Public, State of New York
No. 02DE6069851
Qualified in Kings County
Commission Expires 3-18-10

20

# EXHIBIT 3

8-K 1 broadcaster8k.htm CURRENT REPORT

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, DC 20549

---

# FORM 8-K

---

### CURRENT REPORT

### PURSUANT TO SECTION 13 OR 15(d) OF THE
### SECURITIES EXCHANGE ACT OF 1934

Date of report (Date of earliest event reported): **February 18, 2008**

# Broadcaster, Inc.
(Exact Name of Registrant as Specified in Charter)

| **Delaware** | **0-15949** | **94-286863** |
|---|---|---|
| (State or Other Jurisdiction of Incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

### 9201 Oakdale Avenue, Suite 200
### Chatsworth, California 91311
(Address of Principal Executive Offices) (Zip Code)

Registrant's telephone number, including area code:

### N/A
(Former Name or Former Address, if Changed Since Last Report)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (see General Instruction A.2. below):

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**Item 5.02. Departure of Directors or Certain Officers; Election of Directors; Appointment of Certain Officers; Compensatory Arrangements of Certain Officers.**

On February 18, 2008, four days after the Company commenced mailing of its definitive Schedule 14C regarding action taken by the holders of a majority of the voting power of the outstanding stock of the Company removing Dr. Orza and Paul Goodman as directors of the Company, effective March 5, 2008, Dr. Vincent Orza sent an email to the Company's directors, resigning as a director and member of the Company's Compensation, Audit and Nominating Committees, effective immediately. The email also set forth disagreements with the Company. The email is filed as an exhibit to this Report, together with a response from Martin Wade, III, the Chief Executive Officer of the Company.

Dr. Orza's disagreement with the Company primarily relates to its compliance with its corporate governance standards and certain related party transactions.

**Item 9.01. Financial Statements and Exhibits.**

(a) – (c)  N/A

   (d)    Exhibits.

| Exhibit No. | Description |
|---|---|
| 17.1 | Letter from Martin Wade, III, dated February 22, 2008 |
| 17.2 | Email from Dr. Vincent F. Orza, Jr., dated February 18, 2008 |

## SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

Date: February 22, 2008

**BROADCASTER, INC.**

| | |
|---|---|
| By: | /s/ Martin Wade, III |
| Name: | Martin Wade, III |
| Title: | Chairman and CEO |

**Exhibit Index**

<u>Exhibit No.</u>          <u>Description</u>

<u>17.1</u>            Letter from Martin Wade, III, dated February 22, 2008
<u>17.2</u>            Email from Dr. Vincent F. Orza, Jr., dated February 18, 2008

EX-17.1 2 exhibit171.htm LETTER

**Exhibit 17.1**

**Broadcaster, Inc.**
**9201 Oakdale Avenue, Suite 200**
**Chatsworth, California 91311**

February 22, 2008

Dr. Vincent Orza
2001 Cambridge Way
Edmond, OK 73013

Dear Dr. Orza,

I have received your resignation letter. Given that your removal from the Board by a majority of the Company's shareholders is effective March 5, 2008, your recent resignation letter is entirely unnecessary. Consequently, the only possible explanation for your letter is that you wanted to publicly raise negative issues, irrespective of whether they have any merit, in an effort to distract attention away from your actions while serving on the Board. Although SEC filings, to which your letter must be attached, are not the proper forum to address your many misstatements and falsehoods, a few must be addressed to ensure that those who read your letter are not misled.

I believe many of your misplaced conflicts with the Board, management and certain major shareholders could have been prevented by some basic due diligence. I also believe that these conflicts were exacerbated by your personal relationship with a major shareholder and the Company's terminated financier and advisor, Michael Gardner. I know you have great confidence in Mr. Gardner's business judgment given that he manages your personal investments; and I imagine it must have been nearly impossible for you to reject Mr. Gardner's self-serving demands on the Board given that he sits on the Board of Trustees of the same university where you are the Dean of the Business School. Given your ties to Mr. Gardner, it comes as no surprise that you would defend him and help him transfer blame to others, now that it appears his plan to abandon the Company's revenue generating business model in favor of his social networking concept has failed.

In your letter, you state your concern about the Company's financial condition. You claim that we were spending cash at an alarming and irresponsible rate with little or no revenues. But even a cursory look at our operating budget and business plan shows that the Company had a Board approved plan to spend exactly the amount of cash we were spending. This plan, which you reviewed, and which was urged on the Board by Mr. Gardner, was consistent with many start up companies, in that it projected the Company would not generate revenue until some time in the future.

You say that while on the Board, it appeared to you that there were several unreported related party transactions. If this is true, why didn't you report these transactions to the Audit Committee, of which you were a member? Why didn't you report these related transactions to the Company's securities counsel? Given your silence prior to your

removal as a director, we are mystified as to why you would raise these issues now, on the eve of your departure. Ironically, at the recent Board of Directors meeting that you chose to miss, the Board agreed to retain outside counsel to investigate "related party transactions." The law firm that you selected to investigate such transactions was retained. Of course, it is management's expectation and understanding that this independent law firm will investigate all interested and related party transactions and not solely the transactions noted in your letter.

To suggest that we have made misleading statements at any time, much less in our SEC filings, is a very serious charge and if true, casts aspirations on your own actions and character. Of course, no such misleading statements have been made, evidenced in part by the fact you have not previously seen fit to tell anyone of these misleading statements. For the record, the SEC has not requested we re-state any filing. Our auditors also have not made this request. All the Company's filings have been made in accordance with proper corporate governance and pursuant to the advice of counsel.

Citing specific examples, you allege that management has failed to follow Board directives. For example, you say that management failed to reduce staff per the Board's direction. You are mistaken, by the end of 2007, management reduced staff from fifty-one to six employees. You also note that management unilaterally rescinded a letter of intent to engage in a transaction with another company. It is true that management rescinded the letter of intent, but as you should know, that decision was made to protect the Company and its shareholders from consummating a significant transaction without proper due diligence. Management understands that as a result of its decision to rescind the letter of intent, Mr. Gardner's company was deprived of the significant fees it would have received had the transaction closed; but management cannot make decisions that benefit Mr. Gardner or his company to the exclusion of all other shareholders.

Through pending and anticipated litigation, the true facts surrounding how this Company went from a promising future to its current condition will be made clear and you will have to answer for your actions, chosen loyalties and alliances. Until then, the Company, on behalf of its public shareholders, hopes that you will not further destroy shareholder equity by falsely and wrongfully maligning current management who is working tirelessly to restore value to this Company for the benefit of its shareholders.

.

Sincerely,

/s/ Martin R Wade III

Martin R Wade III

EX-17.2 3 exhibit172.htm LETTER

**Exhibit 17.2**

February 18, 2008

Broadcaster, Inc.
9201 Oakdale Avenue
Suite 200
Chatsworth, CA 91311

Gentlemen:

Effective immediately, I resign as a Director and member of the Company's Compensation, Audit and Nominating Committees. I intend for this letter to constitute a written correspondence concerning the circumstances surrounding my resignation within the meaning of Item 5.02(a)(2) of Form 8-K.

I have serious concerns, which I and Paul Goodman (one of the other independent directors) have expressed about matters pertaining to the Company's failure to comply with applicable corporate governance standards and inability and unwillingness to pursue appropriate business strategies. These issues are exacerbated by the failure of Company management to adhere to directives issued by the Board and Board Committees. For instance, in complete disregard of directives by the Board, management refused to follow Board resolutions in November 2007 calling for a reduction in the number of employees from fifty to twelve. On another occasion, the Board identified in late 2007 a specific merger candidate and then instructed management to execute a letter of intent. Management executed the letter of intent, but cancelled it the following day without adequate explanation or notice to the Board.

Shortly after joining the Board in July 2007, I began asking questions of Company management and reviewing various Company documents, financial and otherwise. My investigation led me to become suspicious of and concerned about, among other things, the Company's finances. The Company appeared to be spending cash at an alarming and irresponsible rate, while generating little to nothing in revenues. Also, there appeared to be several unreported related party transactions occurring on a regular basis, as well as utilization of Company resources to pursue a disruptable business. Furthermore, the Company has made misleading statements in documents filed with the Securities and Exchange Commission, none of which documents were submitted to the Board for prior review or approval. During my time on the Board, I established a clear record expressing concern and dissent with actions of management that I believed were inappropriate.

As a member of the Board, and despite repeated requests by me, I am not being provided with the information necessary to make fully informed decisions or to fulfill my duties as a director. Nonetheless, I am confident that I have executed sound business judgment in my attempts to cause the Company to take actions in the best interest of its shareholders. Despite my sound advice, the Company stated in its latest Information Statement dated February 13, 2008 filed with the Securities and Exchange Commission and being mailed to shareholders that shareholders of the Company have expressed a lack of confidence with my business judgment. The fact that certain shareholders have questioned my judgment is not necessarily surprising, given that my business judgment has caused me to question Nolan Quan and other members of Company management. Mr. Quan controls the vote of approximately 75% of the shares that voted to remove Paul Goodman and me as independent directors.

In addition to establishing a clear record of my concerns and disagreements with Company management, I have made diligent efforts to compel the Board to address my concerns. On January 10, 2008, Michael Gardner (who owns a 20.8% beneficial interest in the Company) caused a Schedule 13D to be filed with the Securities and Exchange Commission. Attached to the Schedule 13D was a letter from Mr. Gardner advising Company management of his concerns with the Company's conduct and demanding that immediate changes be made. In response to this filing, I implored the Board to call a special meeting to discuss the issues raised by Mr. Gardner. No such Board meeting has been held, and the issues raised in Mr. Gardner's letter are still unaddressed. Also, Paul Goodman, one of the independent directors, has delivered to the Company a written analysis of related party transactions of the Company. The concerns expressed in that analysis are not being appropriately addressed.

Finally, beginning on December 21,2007, certain shareholders (the majority of whom are affiliated with Company management) undertook efforts to have Paul Goodman and me removed as directors. This action came shortly after the Board resolved to appoint a special committee to review the financial affairs of the Company. If the removal had become effective at that time, the Company would not have had the requisite number of independent directors. In an attempt to resolve that problem, management has now pursed a plan to appoint two new directors who will purport to the independent director role.

By resigning, I do not intend to waive any indemnification rights or rights under any applicable directors or officers insurance policy.

/s/ Vincent F. Orza, Jr.
Vincent F. Orza, Jr.

# EXHIBIT 4

24 (Pages 90 to 93)

Page 90

Gardner

1
2     Q.     Who is the trustee?
3     A.     There are three trustees.  Paul Goodman
4  is a trustee.  Jonathan Kahn, K-A-H-N, is a
5  trustee, and there is a third trustee.  This
6  evolved from a company by the name of Lan (ph).
7  Lan was a software company.  It was one of the
8  other directors of Lan, and I don't recall who the
9  third trustee is.
10    Q.     So Paul Goodman sits on the board of
11 Broadcaster, correct?
12    A.     That's correct.
13    Q.     Okay, and he's one of the trustees of
14 the trust that you have a beneficial interest in,
15 correct?
16    A.     I think I have about a 10 percent
17 beneficial interest, up and down the line.
18    Q.     Do you have any other business dealings
19 with Mr. Goodman other than Broadcaster and the
20 trust?
21    A.     Business dealings?
22    Q.     Yes.
23    A.     From time to time we've talked about
24 things.  I, I -- Paul represents, Mr. Goodman
25 represents a, represented a company by the name of

Page 91

Gardner

1
2  Aladdin, which has been sold now to a company by
3  the name of Smith Micro.  I did the original
4  Aladdin transaction by which it became a public
5  company and financed.
6           There had been, yeah, there had been
7  other business, and there's been lots of business
8  discussed with Paul, with Mr. Goodman.
9     Q.     What other -- are there any companies
10 that you own that he's involved in?  That you own a
11 piece of.
12    A.     There's a company by the name of Secure
13 Logic, which is now really a public shell, a public
14 entity without an operating company.  Paul is the
15 sole officer and director of that company.  I'm a
16 very large shareholder in it.  I have to, again,
17 look to see how much of it I own, but that's
18 involvement.  Is that what you're looking for?
19    Q.     Sure.  You control Secure Logic at this
20 point?
21    A.     Well, you defined control as
22 50.1 percent before, and if you're staying with
23 that definition, which was yours, the answer would
24 be no, but I own a very large position in it.
25    Q.     Any other companies that you have, that

Page 92

Gardner

1
2  you own a piece of that Mr. Goodman is involved in?
3     MR. GARDNER:  I object to the form, but
4  can you answer it?
5     THE WITNESS:  I can if I remember.
6     MR. GARDNER:  Okay.
7     A.     Not that come to mind at this moment.
8     Q.     Have you ever loaned Mr. Goodman money?
9     A.     It's irrelevant.
10    MR. GARDNER:  I think it's palpably
11 irrelevant, I think is the term.
12    A.     The answer is --
13    MR. GARDNER:  I'll object to it.
14    THE WITNESS:  Should I answer?
15    MR. GARDNER:  Yes.
16    A.     Yes.
17    Q.     When was the last time you loaned
18 Mr. Goodman money?
19    MR. GARDNER:  Objection to the form,
20 implying it's more than once.
21    A.     I've loaned Mr. Goodman money on one
22 occasion.  He had a personal emergency.  I helped
23 him as I would any friend.
24    Q.     When was that?
25    A.     As I think you would.  Six months ago,

Page 93

Gardner

1
2  eight months ago, I don't know, recent past.
3     Q.     Was he on the board of directors of
4  Broadcaster at the time you loaned him money?
5     A.     I believe so.
6     Q.     Okay, how much money did you loan him?
7     A.     $70,000, seven-oh.
8     Q.     And for what reason?
9     A.     Because he needed it very, very badly.
10    Q.     Did he tell you why he needed it very,
11 very badly?
12    A.     I did not get into his personal life.
13 It had something to do with taxes, his liking being
14 a lawyer.  I, I did not get into his personal life.
15 I lent it to him in good faith.  He has since
16 returned every dollar, in one shot.  He had, he had
17 a very serious personal issue that he was greatly
18 concerned about.
19           He came to me as a, as a friend and a
20 person who has the ability to, to do that, and I
21 saw fit to lend him $70,000.  Six months later he
22 came by and said here's your $70,000 and how much
23 he appreciated it.
24    Q.     When did you get repaid?
25    A.     When did I get repaid?  Maybe a couple

Global Deposition Services
212-867-7766

**Page 158**

```
1            Gardner
2    The witness has not said he was on the board.
3    Do you want to ask him if he was on the board
4    of Secure Logic?
5    Q.   In fact, you told him that he --
6         MR. GARDNER: Objection.
7    Q.   -- should resign? Did you tell Sean
8    Deson that he should not resign from the board of
9    Secure Logic?
10        MR. GARDNER: I'm going to object to the
11   form of that question. It hasn't been
12   established that he was on it.
13   A.   I don't recall that at all, no.
14   Q.   Did you tell him that he shouldn't
15   resign from Secure Logic because you were dealing
16   with the Israeli founders of that company?
17        MR. GARDNER: Objection. You've already
18   said you didn't tell him that, you don't
19   recall telling him that.
20   A.   The answer is no.
21   Q.   No? Thank you.
22   A.   You're welcome.
23   Q.   And Vincent Orza, O-R-Z-A, was put on
24   the board and per your recommendation, correct?
25   A.   Yes.
```

**Page 159**

```
1            Gardner
2    Q.   And how are you familiar with Mr. Orza?
3    A.   He's my friend.
4    Q.   He's a friend?
5    A.   He's my friend. I don't know how to
6    answer the question. How am I familiar with him?
7    He's my friend. I talk to him all the time.
8    Q.   He's the dean of --
9    A.   He's the dean of the Meinders School of
10   Business at Oklahoma City University.
11   Q.   And that's the same university that you
12   sit on the board of trustees, correct?
13   A.   It's a university on which I sit on the
14   board, yes.
15   Q.   Are you also his financial advisor?
16   A.   Define "financial advisor." I, I trade.
17        MR. GARDNER: If you're asking him to
18   define it, let him define it.
19   Q.   You trade what?
20        MR. GARDNER: He's asked you to, he's
21   asked you to define it, so --
22   Q.   What do you trade?
23   A.   I don't give him advice, no. He's very
24   much his own guy.
25        MR. GARDNER: Okay.
```

**Page 160**

```
1            Gardner
2    Q.   You trade what?
3         MR. GARDNER: He answered the question.
4    A.   Is that a question?
5    Q.   Yes.
6    A.   Trade what?
7    Q.   You said that you trade.
8    A.   I trade, I trade the stock market.
9    Q.   And then your counsel cut you off.
10        MR. GARDNER: No, he's asked you for, to
11   clarify the question, and if you're refusing
12   he won't answer it. If you want to clarify,
13   you'll clarify.
14        THE WITNESS: How does Vincent Orza's
15   personal life and his assets come into this?
16   Why don't you object to relevance too?
17        MR. GARDNER: Well --
18   Q.   Mr. Gardner, do you manage Mr. Orza's
19   money in any way?
20   A.   Some of it, yes.
21 DI Q.  How much?
22        MR. GARDNER: I'll object to that, the
23   amount of Mr. Orza's financial situation.
24 DI Q.  How much?
25        MR. GARDNER: There may, there may be --
```

**Page 161**

```
1            Gardner
2    no, objection. That, that gets into privilege
3    issues regarding Mr. Orza's finances, and I
4    don't have the authority to speak to that.
5    I'd advise him not to answer unless Mr. Orza
6    chooses to.
7 DI Q.  How much money do you manage --
8         MR. GARDNER: No, I've advised my --
9    Q.   -- of Mr. Orza's?
10        MR. GARDNER: Are you asking him if he's
11   going to take his counsel's advice? Is that
12   the question?
13        MR. MALLOW: I don't hear an instruction
14   from you, counsel.
15        MR. GARDNER: I've advised him.
16        MR. MALLOW: I don't hear an
17   instruction.
18        MR. GARDNER: I've advised him.
19        MR. MALLOW: Advised him of what?
20        MR. GARDNER: And I've stated the reason
21   on the record.
22        MR. MALLOW: Advised him of what?
23        MR. GARDNER: About not answering that
24   question.
25        MR. MALLOW: Are you instructing him not
```

# EXHIBIT 5



MICHAEL P. ZWEIG
Loeb & Loeb LLP

345 Park Avenue
New York, NY 10154

Direct  212.407.4960
Main   212.407.4000
Fax     212.208.2582
mzweig@loeb.com

Via Fax

May 5, 2008

Hon. Louis L. Stanton
United States District Judge
Daniel Patrick Moynihan
United States Courthouse
500 Pearl Street, Room 2250
New York, NY 10007

Re:   Goodman v. Wade et al., 08 Civ. 2851 (LLS)
      Gardner v. Wade, 08 Civ. 2850 (LLS)

Dear Judge Stanton:

We write, as you requested, to confirm the agreement of all parties and their counsel (Peter Sullivan, on behalf of Michael Gardner, Paul Goodman, appearing pro se, Michael Armstrong of Howrey, on behalf of Martin Wade in both actions and Nolan Quan and Blair Mills in the first above-titled action, and ourselves, on behalf of Broadcaster) to the following schedule:

- (1) May 21, 2008 – defendants serve, by hand or e-mail, motions to transfer and/or dismiss in both of the above-titled actions

- (2) June 4, 2008 – plaintiffs serve, by hand or e-mail, papers in opposition to foregoing motions and any cross-motions

- (3) June 18, 2008 – defendants serve, by hand or e-mail, reply to plaintiffs' opposition to motions to transfer and/or dismiss and opposition to any cross-motions

Last, as Paul Goodman agreed during the conference on Friday, he will be providing Loeb & Loeb and Howrey with the affidavits of service for the defendants in his action on whom service has been effected.

We thank the Court for its consideration of this matter.



Hon. Louis L. Stanton
May 5, 2008
Page 2

Respectfully,

Michael P. Zweig
Loeb & Loeb LLP

cc:     Michael Armstrong, Esq.
        Paul Goodman, Esq.
        Brian Gardner, Esq.
        Peter Sullivan, Esq.

# EXHIBIT 6



**MICHAEL P. ZWEIG**
Loeb & Loeb LLP

345 Park Avenue          Direct  212.407.4960
New York, NY  10154      Main    212.407.4000
                         Fax     212.208.2582
                         mzweig@loeb.com

Via Email and First Class Mail

May 9, 2008

Paul Goodman, Esq.
Cyruli Shanks Hart & Zizmor, LLP
420 Lexington Avenue
Suite 2320
New York, New York 10170

          Re:   Goodman v. Wade et al., 08 Civ. 2851 (LLS)

Dear Paul:

          We write to you at this time because, while I realize that this may have slipped
through the cracks, we have not yet received the affidavits of service which you agreed to
provide at the conference before the Court last Friday, May 2, 2008.  These are obviously
pertinent to the motions to dismissal and transfer.  We request again that they be provided, or
please advise if they will not be.

                         Very truly yours,

                         Michael P. Zweig
                         Loeb & Loeb LLP

cc:    Michael Armstrong, Esq.
       Peter Sullivan, Esq.